Alan R. Ackerman, Esq. (AA9730)
Law Offices of Alan R Ackerman
1719 Route 10 East, Suite 106
Parsippany, NJ 07054
(973) 898-1177
araesq@alanackermanlaw.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

| | |
|---|---|
| KASHMIR GILL, Individually, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Case No. |
| | : |
| JUS BROADCASTING CORP; JUS PUNJABI, LLC; | : |
| JUS ONE, CORP.; JUS BROADCASTING CORP | : |
| PVT LTD; and PENNY SANDHU | : |
| | : |
| Defendants. | : |

_____

## **COMPLAINT**

Plaintiff, Kashmir Gill, individually ("Plaintiff" or "Gill"), hereby sues the Defendants, Jus Broadcasting Corp, Jus Punjabi, LLC, Jus One Corp, Jus Broadcasting Corp Pvt Ltd (sometimes collectively referred to as " Jus Punjabi" or "Defendant Corporations") and Penny Sandhu ("Sandhu") for damages, attorney's fees, litigation expenses and costs associated with Defendants violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), breach of its obligation to issue shares of stock in each of the Defendant Corporations, failure to disclose it books and records, an accounting, dissolution of all entities, failure to properly manage and control its finances and management, breach of fiduciary duty, fraud, breach of contract, promissory estoppel, conversion, deceit, unjust enrichment, piercing the corporate veil and failure to repay loans to Plaintiff and fraudulent actions.

## JURISDICTION

1.  This court has original jurisdiction pursuant to 28 U.S.C. §1332 as a result of the complete diversity of the parties and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

2.  Plaintiff resides at 51 Station Road, Morganville, New Jersey 07751.

3.  Defendants have their principal address at 36-01 36th Ave, Long Island City, NY 11106.

4.  Therefore, there is complete diversity among the parties.

5.  Venue is properly located in the District of New Jersey.

## FACTS COMMON TO ALL COUNTS

6.  At all times hereinafter mentioned Sandhu is the principal member/shareholder of Defendant Corporations, and acts as its chief operating officer.

7.  Plaintiff is an individual having prior experience with Punjabi Media in both India and the United States.

8.  Since her entry into United States in 1999, Sandhu and related persons and entities at various times, have unlawfully schemed to harm investors, people reposing confidence and monies with them including Gill.

9.  To carry out its unlawful scheme, Sandhu has conducted a criminal enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). Specifically, between 2001 and the present, Sandhu has knowingly and intentionally submitted false and materially misleading Declarations, promises, writings to Plaintiff and governmental authorities to keep her criminal enterprise alive.  Sandhu ran

2.

a Ponzi-scheme borrowing monies with false pretenses and thereby by duping people of their hard-earned monies.

10.     Sandhu's engineered racketeering activities were calculated to harm, fraudulently mislead Plaintiff, thereby depriving him of his valuable money.  Sandhu knew that if she had asked monies from Plaintiff as a lender, he would have asked for security or would not have extended the monies as he did here.  Sandhu knew that by misrepresenting and concealing her designs and motives, she could fleece the Plaintiff.  As a result of engaging in its unlawful scheme, Sandhu has profited by receiving sums of money over a period of time exceeding 2 million that she would not have otherwise had it, had she disclosed that she was merely wanting unsecured loans. By further inducing Plaintiff to continue to extend more monies, falsely claiming that he was a partner of her various entities, she further committed a serious fraud on the Internal Revenue Service.  She has not stopped.  In executing its criminal enterprise, Sandhu's crimes have included:

- Mail fraud in violation of 18 U.S.C. § 1341;

- Wire fraud in violation of 18 U.S.C. § 1343;

- Financial institution fraud in violation of 18 U.S.C. § 1344

- Unlawful monetary transactions in violation of 18 U.S.C. §§ 1956 and 1957(a);

- Inducement to interstate or foreign travel in violation of 18 U.S.C. § 2314; and

- Tax fraud, 26 USC 7201

In her pursuit through greed, cheating and forgery, she managed to waste or seriously hurt a few families. Plaintiff is one such victim.

11.     The Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, of the mails, emails, phone calls, wire transfers of monies

in connection with the transactions, acts, practices and courses of business alleged herein. A substantial part of the events occurred in New York, New Jersey. London, Chandigarh, India.

## ENTRY OF SANDHU IN UNITED STATES AS A JOURNALIST

12.     In and around 1999, Sandhu came to the United States along with her husband Yogesh Yogiraj ("Yogiraj") as a media representative[1], claiming to be gainfully employed as a journalist in India.   Sandhu promoting herself as a journalist obtained an employment with International Television Broadcasting Inc. (ITV), a New York company, misleading the then owner of ITV, now deceased, Dr. Banad Vishwanath that she was authorized to work with them within the United States.[2]   While in fact the truth was that  Sandhu had never worked as a reporter or a correspondent or a journalist in India and that she was not gainfully employed in India and that she was also not allowed to work with ITV.

## THEFT AND FRAUD BY SANDHU WITH HER FIRST EMPLOYER

13.     Around 1999, Sandhu and Yogiraj solicited advertisers and placed ads with the ITV for which they were paid a commission upon receipt of payment for the ads which were broadcast on ITV's affiliated channels.   Sandhu and Yogiraj formed a company called, Global Village Concepts, Inc. (GVC) and used this as a vehicle to "commit wrongs and divert funds that were paid by advertisers and intended to pay for advertisements broadcast on ITV affiliated channels.

14.     Commencing in January 2000 through March 9, 2004, Sandhu and her husband placed orders for advertisers and orders for sponsored television shows which were broadcast on

---

[1] 8 U.S.C.A. § 1101(a)(15)(I) [INA § 101(a)(15)(I)]; 22 C.F.R. § 41.60(a). 9 FAM 402.11. The statute provides for temporary status for a bona fide representative of a foreign press, radio, film, or other foreign information media seeking to enter the United States solely to engage in such vocation. Temporary status is also provided for the media representative's spouse and children.

[2] The law was clear: 8 C.F.R. § 214.2(1). A media representative may be admitted to the United States for the duration of employment, contingent on an agreement not to change the information medium or employer without permission. 8 C.F.R. § 214.2(i).

ITV's channels, totaling more than $272,625.00.  Sandhu collected more than the stated amount and did not deliver the same to ITV.  Sandhu deliberately diverted and misappropriated the sums which rightly belonged to their employer.

15.     Also, during this time, Sandhu and Yogiraj entered into agreement with ITV's owner Dr. Vishwanth, to negotiate and obtain the Indian TV channel, Doordarshan International Program rights for ITV or assign the contract to ITV if they obtained it. Dr. Vishwanth trusting them, paid them more than $277,754 as compensation and reimbursement of expenses. Yogiraj went to India, obtained the Doordarshan in their company's name. In India,  Sandhu and Yogiraj misled the Indian government "concealed and failed to disclose to the Broadcasting Corporation of India that the Doordarshan contract was to be issued to ITV and misrepresented and mislead the Broadcasting Corporation of India into believing that it was contracting with a subsidiary or affiliate controlled by ITV when in fact it was a corporation organized, owned, controlled and operated by Sandhu and Yogiraj.  They obtained the contract in GVC's name and misappropriated it in their name. Dr. Vishwanth brought a legal proceeding against them. In order to thwart the lawsuit, both Yogiraj and Sandhu sought bankruptcy protection. The lawsuit was stayed. Meanwhile Dr. Vishwanath, who was ailing, died.

**FRAUD UPON FIRST BUSINESS PARTNER**

16.     Sandhu continuing with her business modes operandi solicited a successful businessman in the construction industry, Lakhvinder Singh ("Singh").  Sandhu proposed that since both Singh and she happened to be from the same community, they should start a TV channel.  In September 2006, Singh entered into a business agreement and partnership, with Defendant Sandhu to operate a new television and media business, called Jus Punjabi LLC d/b/a Jus Punjabi to serve

the Punjabi immigrant and ethnic community in the United States.    Singh invested over $400,000.00 of his personal funds into Jus Punjabi.  In addition to the money invested, Singh expended in excess of $100,000.00 to purchase materials and to build the studio for Jus Punjabi. Singh spent considerable time and effort to build the business.  Pursuant to the Operating Agreement, Singh and his wife were to have a fifty percent (50%) interest in any other entities formed by Jus Punjabi, LLC.  Singh invested his time to promote the business and was instrumental in convincing Time Warner Cable Company to broadcast Jus Punjabi TV Shows.

17.    Meanwhile, Sandhu opened several other entities.    Due to his failed asylum application, Singh was taken into custody by the Immigration Authorities and deported to India. Prior to the deportation from August 15, 2008, for a period of eight (8) months, Singh was detained at various immigration detention centers (New York, New Jersey, Alabama), by ICE. Sandhu and Karl Khandalawala contacted Singh through his wife.  Singh then contacted Sandhu who made repeated false misrepresentations in regards to the business being on the verge of collapse and bankruptcy, while Singh was confined at an immigration detention center and had no means to verify the misinformation he received.  Sandhu prepared paperwork and falsely induced the wife of Singh to assign all of their interest in Jus Punjabi to her.   Singh was deported and could not pursue his claim. When Singh was permitted to return to the United States, the time to assert his claim had lapsed.

18.    Sandhu requested Khandalawala to arrange the money to pay Singh's as part of their settlement. Khandalawala arranged the loan from his family members. Singh's were paid, and they assigned their 38% membership interest in Jus Punjabi, LLC to Khandalawala.

**SECOND BUSINESS PARTNER TAKES A TOLL, KARL KHANDALWALA**

19.     Once the monies had been obtained from Singh and the infrastructure had been provided, Sandhu asked one Karl Khandalwala to become her partner as a marketing promoter and investor to take her business to a higher level.  Sandhu, scoured the entire family of Khandalwala to borrow money.  Khandalawala become a partner is Jus Punjabi.

20.     Soon the relationship soured.  Sandhu approached the Plaintiff, Kashmir Gill. She asked him to be a partner in her business venture claiming that Jus Punjabi was an excellent investment opportunity and with unlimited potential.

21.     In 2010, Khandalawala became ill and was not able to perform his duties as a partner. Sandhu tried to persuade him to sell his membership back to her for $660,000.00. Khandalawala did not want to do that, but under constant pressure from Sandhu and because of his struggle with Bipolar Disorder, he agreed to sell his membership back to Sandhu. His only condition was that Sandhu need to repay Advani and Khandalawala at the same time.

23.     In August 2012, Sandhu made Khandalawala sign an agreement pursuant to which Khandalawala agreed to relinquish any membership interest in Jus Punjabi in exchange for $660,000.00.   Sandhu agreed to make monthly payments to Khandalawala.  Sandhu defaulted. Khandalawala filed a lawsuit which was settled and Sandhu started repaying the debt.

**PLAINTIFF IS ROPED IN**

24.     Gill's exposure to or meeting with the Sandhu started in and around 2010 when a promoter of Gurdas Mann, a very popular Indian folk singer, requested Plaintiff to take Gurdas Mann to the Jus Studio for an interview. Similarly, another Indian politician, Sikhander Singh

Maluka was taken to the Jus Studio for a live show. During Gill's second visit, Sandhu invited Gill to her office in the Studio to talk.

25.      Within a month's time, Sandhu asked Plaintiff for $25,000.00 for 180 days, claiming she was afraid she would not be able to live up to her contractual obligation with a Sikh religious church, wherein she had promised them to broadcast their religious ceremonies. She expressed that she would be ridiculed, and her Studio reputation impaired and she would lose business.  She explained that broadcast would be not feasible without the proper equipment installed at the location; she wanted same completed on an emergency basis. Gill agreed to help and she went to an Indian restaurant called "Akbar" in Edison, New Jersey to pick up the check. However, when the check was not returned within the promised time, Plaintiff demanded payment.  Sandhu stated that she would return the money on one condition that Gill comes out to dinner with her. Gill declined. After having been requested once again, on March 30th, 2011, she wired the money to Gill's bank account

26.      On October 18, 2011, Sandhu texted Plaintiff that she needed to have $31,000.00 on an emergency basis as SES, a Satellite company, threatened to terminate the Jus Punjabi signal, which would result in a blackout of the program.  She assured him that the money would be paid back within a months' time. Gill deposited the money to her business account (TD Bank). This money is still outstanding.

27.      In November 2011, Sandhu came to meet with Gill and his business partner, Bikram Gill. Sandhu asked them to invest $ 1.5 million for 15 % stake in her business. When asked about the dividends or profits from business, Sandhu advised that, they would not get more than a 5% return on their investment, but in the long-term company will be worth a lot. Gill advised Sandhu

that they were not impressed with the return on investment suggested, as they get a much better return in their fuel business.  Bikram Gill asked Sandhu to send him all the financial documents for his review and Sandhu promised to do that.

28.     On November 30, 2011, Sandhu sent following documents via email of her company to Bikram Gill: Asset statement, Business Plan, Loan Statement, and P & L statement.  After going through all the documents, the Gills decided not to invest in to Sandhu's company. Gill relayed the decision to Sandhu via phone.

29.     Following the rejection, Sandhu's requested that Plaintiff to get involved in her business as a business advisor and lender. Trusting her offer and accepting it, Plaintiff proposed a business plan and his financing of the same:

i.      Upgrade the studio with new equipment (Gill promised to loan her the money for that).

ii.     Bring all the good anchors and staff members back to improve programming.

iii.    Get all the employees to sign a job and sales contract. (Gill promised to get those contract's done by a lawyer).

iv.     Work with the creditors to get rid of the loans.

v.      Negotiate with vendors to lower the fees.

vi.     Get rid of all the working/ silent business partners and investors.

Sandhu agreed with Gill's business plan and requested Gill to take lead in executing the plan. Gill accepted the responsibility of executing the business plan as per Sandhu's request. Gill advised Sandhu that it will take at least a year to year and a half to execute the plan.

## **EXECUTION OF BUSINESS PLAN**

30.     As per Plaintiff's commitment to execute the business plan, Gill provided the funds as a loan from December 12, 2011 until February 28, 2013.

31.     In December 2011, Gill met with Harvinder Riar, a former anchor at Sandhu's channel (Jus Punjabi), who had started working for another Punjabi channel called "PTC Punjabi" after he was fired by Sandhu. Plaintiff convinced both Riar and Sandhu to settle their differences and return to Jus Punjabi to advance channel ratings.   Riar agreed.  Plaintiff then worked with Riar to bring back Deepak Dhiman (Cameraman) and Parwinder Virdee (Cameraman/ Editor) to Jus Punjabi. Both agreed, and the channel ratings soared.

32.     Gill also travelled to Baltimore, MD with Sandhu to meet Donna Thomas, an attorney to get the employee contracts done. These contracts were prepared in January of 2012.

33.     Around this time, Gill met Umesh & Sooraj Advani from Sona Realty (Sona), a creditor, to attend to their demands for repayment of the loan with interest extended by them to the defendants.  Sona had loaned $580,000.00 to Sandhu on October 27, 2008 for one year with an interest rate of 18%. Their first payment was due on November 1, 2008 and the last payment on October 31, 2009. Sandhu had to give 10% ownership interest in Jus Punjabi, LLC to Sona as a collateral for the loan. Sandhu was not able to pay them back and they were putting lot of pressure on Sandhu. This loan was arranged by Sandhu's business partner, Karl Khandalawala. Sandhu needed this money to buy out her previous business partner', Lakhvinder Singh & Mrs. Praveen Singh. Lakhvinder Singh was arrested by immigration and was in process of deportation.  Sandhu requested Khandalawala to arrange the money to pay the Singh's as part of their settlement.

Khandalawala arranged the loan from his family members. Singh's were paid, and they assigned their 38% membership interest in Jus Punjabi, LLC to Khandalawala.

34.     In 2010, Khandalawala got sick and was not able to perform his duties as a partner. Sandhu tried to persuade him to sell his membership back to Sandhu for $660,000.00. Khandalawala resisted, but under constant pressure from Sandhu and suffering with bipolar disorder, he agreed to sell his membership back to Sandhu. His only condition was that Sandhu need to pay back Advani and Khandalawala at the same time.

35.     Gill met with Sandhu's business partner Karl Khandalawala, and both started to work out a global settlement for them, with Sandhu. Gill spent eight months of his personal time to make a deal, but it became very difficult to convince Advani to settle. Finally, Gill realized that it may not be possible to reach a deal with both the parties at the same time, so Gill started to persuade Khandalawala to execute his agreement. Gill also promised him to take care of his family's loan payment.  Gill convinced Khandalawala to sign a deal with Sandhu to sell his membership back to Sandhu. Finally, on August 6th, 2012 Karl signed the agreement to sell his membership back to Sandhu for $660,000 in the office of Karamvir Dahiya. On 08/27/2012, Gill paid Sandhu $30,000 to pay Khandalawala as down payment for his settlement.

36.     While Gill was working with the creditors and ex-partners to settle with Sandhu, he worked with the different vendors of Jus Broadcasting to lower their fees. Gill asked Sandhu about all the big expense items in her company. Sandhu told Gill that her biggest expense after the payroll was the satellite fees. Gill asked Sandhu's permission to negotiate with the satellite company, but Sandhu told him that these companies do not negotiate, as her attempts were unsuccessful. She instructed Plaintiff to negotiate with them.  The company was charging Sandhu $17,500.00 per

month. Plaintiff negotiated with a satellite company that carried signal from the studio to different platforms for over two months and successfully negotiated a reduced fee of $9,300.00 per month. The total savings of that effort was $8,200.00 per month.

37. After settling with Khandalawala, Gill started negotiating with Advani. Gill worked extremely hard for almost six months, settling the Advani claim of $1,200,000 for one-time payment of $450,000.00. Gill told Sandhu to arrange the money to pay Advani, which was due on 03/15/2013.

## MEETINGS TO DISCUSS $450,000.00 PAYMENT
## AND TO BECOME PARTNERS (2013)

38.    When Plaintiff asked Sandhu to arrange the money to pay Advani, Sandhu expressed her inability to arrange the monies. She asked Plaintiff if he could arrange the money to pay Advani. Plaintiff told her that he has already loaned her lot of money and he won't be able to extend any more money to her business or on her behalf to the creditors of the business.  To raise that money Plaintiff and Sandhu started exploring the possibility of them becoming partners in Sandhu's business. Plaintiff made it very clear to Sandhu that he would entertain the partnership only if he gets 50% partnership interest in all her entities. Both met few times and negotiated the terms of the partnership. Finally, on 03/04/2013, Gill & Sandhu met at "The Park Place diner' in Aberdeen, New Jersey and reached an agreement to become equal partners in the following entities:

1.    Jus Punjabi, LLC
2.    Jus One, Corp
3.    Jus Broadcasting, Corp
4.    Jus Broadcasting Pvt Ltd

39.    Sandhu asked Gill for a dollar bill. Gill gave her a dollar and she memorialized the partnership agreement on the bill "Partnership for life. 03/04/2013". *This is a traditional way in*

*India to make   a "business agreement" legal.* After the breakfast meeting resulting in a partnership agreement (Partnership Agreement) Sandhu & Gill went to Gill's office to tell Bikram Gill about the deal. Three of them decided that, Sandhu will keep on running the company as a CEO/ President and Gill brothers will stay behind the scene and support the channel financially and logistically. Sandhu requested "Gill brothers" to appoint one person out of them, who Sandhu should be dealing with on day to day basis. Bikram Gill proposed Plaintiff's name to work closely with Sandhu to move the company forward.   Sandhu advised Gills to not to disclose the partnership in the market for the following reasons:

     i.     Dish Network representatives are not comfortable with ownership changes;

     ii.     Advertisers might try to approach her through Gill's connections to reduce their payments;

     iii.     She did not want this to be a public knowledge, fearing people might think that she has lost the control of her company.

However, the same was not advice, rather it was a ploy to induce Plaintiff to continue to funnel money into the Defendant entities. Sandhu wanted to continue to tap the promise of the "partnership" personally and continue the scam. Plaintiff trusted her integrity and believed her promises of partnership. He naively thought that the three conditions were necessary for the Jus business.

**PAYMENT OF ADVANI LOAN**

40.     As a condition for the promised Sandhu & Gill Partnership Agreement, Gill arranged a certified check in the amount of $450,000.00 to pay Advani. Both Sandhu & Gill went to Advani

13.

and paid them.  To celebrate, Sandhu, Gill, Dahiya and two of Dahiya's other friends went for a dinner at "Chotte Nawab" Indian restaurant.

### MOVING THE COMPANY FORWARD AS PARTNERS

41.      Sandhu promptly created a new email id (kashmirgill@jusbroadcasting.com) for Gill in the company.  Sandhu constantly asked Plaintiff, for the business title that he would prefer on his business card. However, Gill respectfully told Sandhu that he did not need a title to be a partner as long as she treated him with respect and was honest with her business life. Both Sandhu and Gill started attending meetings with their business acquaintances in the media business, company officials from different carriers, Dish conventions etc. Gill travelled to Toronto, Vancouver and India to find new opportunities for the defendant companies. Sandhu told Plaintiff that if they could increase the number of channels, then she can get Dish network to create a special Punjabi pack called "Jus Pack" and Dish Network will sell that pack separately to their customers. This would increase the revenue stream.  Gill promised her that he will work very hard to get channels from India and for "Jus Pack" and Gill started negotiating with the following channels in India to bring them into Jus Pack:

1.    Day and Night- News channel
2.    9X Tashan- Music channel
Gill and Sandhu wanted to create the "Jus pack" with the following channels:

1.    Jus Punjabi- General Entertainment
2.    Jus One- Spiritual channel
3.    Jus 24*7- News channel with Day & Night programming
4.    9X Tashan- Musical Channel
5.    Jus Now- 24 hours movie channel

42.      In the spring of 2013, Sandhu stated that her astrologer just cautioned against entering into the Unit Sale Agreement for a period of 5 years. Plaintiff, who was aware that Sandhu

was a devotee of astrology, agreed not to pressure her for the Formal Agreement. Sandhu repeatedly stated to plaintiff that they were equal "partners" and the dollar bill which had been signed was more important than any agreement prepared by lawyers.  However, this again was a ploy and a part of the continuing scheme to defraud.

43.     June of 2013, Sandhu introduced Gill to her accountant, Niranjan Bapat. Sandhu advised Bapat about the partnership agreement and how Gill would restructure the company. Gill told Bapat that he would like to merge all the companies (Jus Punjabi, LLC, Jus One, Corp) into one company "Jus Broadcasting Corp". Plaintiff also told Bapat that he would like to convert Jus Broadcasting Corp into an S Corporation. This change would allow the subscription money that was coming from Dish Network and other platforms and the advertisement revenues to be channeled into one entity that would increase the gross sales and consequently the valuation of the company. Both Bapat and Sandhu agreed with Gill's idea of reorganization. However, Bapat told Gill that he could not convert a C- Corp to an S- Corp as it will not work for Sandhu because of her immigration status. Gill told Bapat to do whatever makes more sense for Sandhu.

44.     Meanwhile Sandhu was scheduled to undergo a surgery in the beginning of July 2013. After the surgery she got infected and was readmitted to the hospital for two weeks.  She requested Plaintiff talk to all the employees as they were getting anxious about Sandhu's long absence from the studio. Gill spoke to the employees and calmed them down, which was proper for him to do as a partner. Gill exercised his partnership responsibility.

45.     During Sandhu's hospitalization, she told Gill that one of her minor partners in Jus Punjabi, LLC, Dr. Rajwant Singh, wanted to sell his 1% membership back to the company. Plaintiff told Sandhu to not to worry, and he visited Dr. Rajwant Singh on July 23, 2013 and paid him

$50,000.00 to purchase his stock certificate interest.  Gill returned to the hospital and delivered the stock certificate to Sandhu.

46.     After Sandhu was released from the hospital, she requested that Gill allow Sandhu's daughter to retain a small stockholder interest.  Since Plaintiff and Sandhu were equal partners and if she had to give part of her shares to her daughter, then Sandhu will become a minor partner. Gill assured Sandhu that whenever her daughter wants to join the business, he would match exact number of shares as Sandhu's share to give to her daughter free of charge, even though Gill has paid a significant amount for these shares. Sandhu expressed appreciation for Gill's gesture.

47.     Working together as a team, Gill and Sandhu launched another channel Jus 24*7 on Dish network. They also started a Radio network called Jus Radio. Gill contacted few companies in India through his personal connections to bring their channels to USA under Jus brand.

48.     Gill negotiated a contract with an Indian based channel called "Day & Night". Day & Night was a premium news channel and was owned by a close friend of Gill. Gill negotiated a Memorandum of Understanding for $5,000.00. Unfortunately, the Contract demands prohibited a final agreement.

49.     In end of 2013, another Punjabi channel "Get Punjabi" started on Dish satellite. Get ownership consisted of some local people from NY and from India. Sandhu's former accountant gave all the information about Sandhu's business to the "Get" ownership. The ownership's only agenda was to destroy the business of Jus Punjabi at any cost. They started going after Jus' customers and offered free advertisement and defamed Jus Punjabi. On the advice of Sandhu's counsel and friend Karamvir Dahiya, Sandhu and Gill retained Paul Batista, Esq. to file a complaint against "Get Punjabi" and its ownership. Gill paid a $20,000.00 retainer to Batista. Once the

complaint was filed "Get Punjabi" turned their signals off and they were off the air permanently. That gave Jus broadcasting an open field and competitive edge.

50.     Gill worked very hard for a year to negotiate and secure an agreement with 9X Media from India to get the rights of their premium Punjabi music channel called "9X Tashan" for North American market. Finally, an agreement was signed in May of 2014. Plaintiff successfully negotiated an agreement for a monthly fee of only $2,000.00 for a seven-year term. The channel was launched in the month of August 2014. When Gill started with Sandhu, she had only two TV channels:

    1.    Jus Punjabi       (General Entertainment Channel)
    2.    Jus One          (Spiritual Channel)

With the help of Gill's financial investment and industry connections/ expertise, two additional TV channels and a Radio station were launched in USA:

    3.    Jus 24*7        (Comedy Channel)
    4.    9X Tashan     (Music Channel)
    5.    Jus Radio      (Radio Station)

51.     Sandhu & Gill's dream of creating a "Jus Pack" was realized. Jus Pack was launched by Dish network sometime in end of 2014. According to Sandhu' s P&L statement that she sent Gill in 2011, she had no advertisement revenues between 2008- first part of 2011. But after Sandhu-Gill team was done executing the business plan of December 2011, the advertisement revenue started rising. Late August or September of 2014 Sandhu told Gill that the advertisement revenues for the previous month was close to $100,000.00. This was result of Gill's efforts.

52.     Sandhu refused to share any financial information with Gill, even though he was an equal partner. After the creation if Jus Pack, Gill started seeing a change in Sandhu's behavior. Gill

asked her about this change, and she told Gill to not to worry about anything, as Gill was a trusted partner and soon the partnership agreements would be completed and given to Gill.

53.     On September 3, 2014, Sandhu called Gill and told him that it was time for the company to move into the Canadian market. It is very hard to find the bandwidth on cable platforms in Canada, as the CRTC (Canadian Radio- Television and Telecommunications Commissions), has very stringent rules for foreign television and broadcasting companies. CRTC rules do not allow foreign companies to own 100% shares of a Canadian company. Gill called his friend Surjit Gill who owns a TV channel called "Channel Punjabi Television." His channel is available on all the cable and satellite platforms throughout Canada.  Surjit Gill travelled to NY on September 9, 2014. Gill negotiated a deal to buy "Channel Punjabi Television'' for $1,000,000.00 with only $100,000.00 as a down payment. The balance of the money was to be paid over ten years without any interest. On September 11th, 2014, a memorandum of agreement was signed by Sandhu and Surjit Gill.

54.     Sandhu rejected the agreement claiming she could launch channels in Canada for free, and did not need to pay to buy the channel. Gill was not very happy with the decision, but he followed Sandhu's lead, as he could not impose his will on her as she was an equal partner.

### SANDHU'S VISIT TO GILL'S OFFICE, MATAWAN NJ

55.     Around November 13th, 2014, Sandhu came to see Gill in his office and told him that "seems like this partnership may not work", as both Gill & Sandhu are strong minded, and she had very bad experience with her previous partners. Sandhu told Gill that that she valued Gill's friendship more than a partner. She also informed Gill that she has already started working with an investors group, which would take our company to Wall Street. Sandhu informed Gill that she

would return Gill's money by January of 2015. After the meeting, Sandhu told Plaintiff that he needed to wire $81,139.00 to advance media for the equipment that was bought by Jus Broadcasting, Corp. Gill went to Wells Fargo along with Sandhu and wired the money as shown in. They had lunch together and after the lunch Sandhu told Gill that *"don't worry as nothing has changed, and you are still a strong partner of the channel"*. Gill did not like that and became very confused with this new situation.

56.     Plaintiff felt that that all these talks with her, signing off on the dollar bill, introducing him as a partner, email creation was a systematic setup to exploit him and obtain monies under the false pretense.

## LAUNCH PARTY OF TASHAN, ASTORIA, NY

57.     On December 3rd, 2014, all the guests invited by Sandhu got together in Astoria, NY to attend the second launch party for Jus. Gill did not want to go, but Sandhu told Gill that she has a surprise for him. Gill took Bikram Gill and their wives to the function. Gill and Bikram Gill were under the impression that Sandhu will introduce them to the community as her new partners, but once again Gill was introduced *"as a strong supporter of the channel"*. Both Gill and Bikram Gill were shocked and embarrassed by Sandhu's actions. For the first time Gill realized that Sandhu may have betrayed him, but she insisted that, they are partners in the business.

## POST LAUNCH PARTY OF 9X TASHAN

58.     After the launch parties were over, Gill started working on a dance competition that the channel had started few months back called "Jus Bhangra". Gill provided additional funds for this competition. After the competition finished, Sandhu stopped sharing any business information with Gill. Gill pleaded with her to sign a shareholder agreement, but she continued to delay.

19.

59.     Gill felt betrayed and stopped going to the studio. Gill was hoping that Sandhu would realize her mistake and contact him. Sandhu never contacted Plaintiff. Gill realized that Sandhu used him for all these years and she never had any intention of signing the partnership agreement. She used Gill to fulfill her dream of creating a "Jus Pack". She kept on using Gill's money, political connections, and media connections and once her mission was accomplished, she started planning to get rid of Gill.

### KARL KHANDALAWALA VS SANDHU

60.     On February 2, 2015, Sandhu's former partner Khandalawala filed a suit against Sandhu for non-payment of monthly payment for buying his membership back as per the agreement she had signed on August 12, 2012. Sandhu called Gill requesting that he handle the complaint. Gill requested Paul Batista to take care of the suit.  After litigating for few months, Batista requested that Gill call Khandalawala and settle the claim. Batista felt that Sandhu was not being truthful with him and told Gill that he would not represent Sandhu again.

61.     Gill contacted Khandalawala and his wife Deepu and convinced them to sign an apology letter to not to disparage all defendants, as Plaintiff was concerned about their reputation. Both trusted Gill and signed the settlement agreement. They also advised Gill to stay away from Sandhu and according to them she had a reputation in the market of exploiting and cheating her partners.

62.     Gill delivered the signed agreement to Sandhu in a restaurant in Manhattan. In that meeting Gill asked again for the agreement and Sandhu gave Gill a blank yellow paper from her note pad. Sandhu signed the bottom of the paper and told Gill to write the contract on that one paper.

Sandhu told Gill that she is just too busy, but she will soon go to the attorney and get the paper work done.

## NEW SKIES SATELLITE B. V. VS SANDHU

63.     On February 17th, 2015 New Skies Satellite B.V filed a suit against Sandhu and Jus Punjabi for the breach of a contract. They demanded and eventually obtained a judgement against Sandhu in the amount of $160,000.00. Gill negotiated with Plaintiff's counsel and obtained a settlement for $40,000.00.  Gill gave a certified check and hand delivered to Kazlow's office on August 28, 2015.

## NEW STUDIO IN CHANDIGARH, INDIA

64.     In November of 2015 Sandhu requested Gill to help Sandhu to set up a studio in Chandigarh (India). Gill refused to invest any more money into Jus Broadcasting, and demanded a shareholder agreement and access to the books and records of the company. Sandhu again gave an impression to Gill of Gill being a strong partner. Sandhu convinced Gill that it was very important to have a studio in India and that the books and records issues could be dealt soon thereafter.  Later Gill provided the funds and all the logistical support to Sandhu and the studio was set up by January of 2016, Sandhu started producing some of the programming for the channels in that studio as production is much cheaper in India.

## SANDHU'S REQUEST IN 2016

65.     On August 25, 2016, Gill received an email from Sandhu with the following:


From: **Penny K Sandhu - JUS TV** <penny@jusbroadcasting.com>

Date: Thu, Aug 25, 2016 at 3:03 PM

Subject: Need this urgently - Please print it on simple paper and sign it, kindly send me email. Need it for acts purpose IRS

To: Kashmir Gill - JUS TV <kashmirgill@jusbroadcasting.com>

Dated July 22, 2016

To Whom It May Concern

This is to state that the long-term debt $....carried on the books of JUS Punjabi LLC accounts is converted to capital stock and accordingly stock certificate is issued.

Penny K Sandhu                                    Kashmir Gill

President                                               Stockholder

PS: was waiting for your call yesterday. didint hear back from you.

**Penny K Sandhu**

*President & CEO*

Tel: +1-718-752-9290 X 102

**JUS Broadcasting Corp.**

**HOME OF 4 TV CHANNELS and ONE RADIO**

**Tel: 718 752-9290** / **718-PUNJABI**

**Fax: 718-752-9212**

P.O.Box 3196, L.I.C. NY 11103

www.jusbroadcasting.com



*The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.*

66.     Trusting his partnership agreement was finally being formalized, Gill signed that letter and sent a copy of the same to Sandhu on September 2, 2016 with the following response:

On Fri, Sep 2, 2016 at 3:03 PM, Kashmir Gill - JUS TV <kashmirgill@jusbroadcasting.com> wrote:

Dear Penny,

Attached is the letter that you requested. As you know I had invested all this money over last six years in to your companies, on the basis of our mutual agreement of us becoming equal partners in your business enterprise. I never received any documentation to that effect. I trusted you then and will continue to do so in the future. I have tons of respect and admiration for you.


regards,

67.     Gill wrote a follow up email to Sandhu:

On Fri, Sep 2, 2016 at 3:12 PM, Kashmir Gill - JUS TV <kashmirgill@jusbroadcasting.com> wrote:

Kindly send me a signed copy back.

68.     Following is Sandhu's response to Gill's previous mail:

On Fri, Sep 2, 2016 at 3:59 PM, Penny K Sandhu - JUS TV <penny@jusbroadcasting.com> wrote:

Thank you, Kashmir, you are the best. Will talk later this evening


**Penny K Sandhu**

*President & CEO*

Tel: +1-718-752-9290 X 102

Sandhu signed the letter and emailed a signed copy back to Gill.

## PARVEEN SINGH & LAKHVINDER SINGH VS SANDHU

69.     In the end of November 2016, Sandhu called Gill and advised that her former partner and his wife filed a suit against Sandhu. Gill advised Sandhu to go to Paul Batista, but she refused. Sandhu wanted to use a law firm from Long Island. Gill arranged a meeting with the law firm and Sandhu and her daughter. After coming out of the meeting, Gill once again suggested to Sandhu to

go to Batista. Sandhu requested Gill to talk to Batista. Gill called Batista to represent Sandhu, but Batista refused to do it initially. He made it very clear that he did not want to represent her. Gill requested Batista to take the case as a favor to Gill.  Batista told Gill that he cannot say "No' to Gill as Gill is a close friend. Once Batista started litigating the case for Sandhu, Sandhu once again started ignoring Gill from the business.

## **DINNER MEETING WITH SANDHU & SANDHU'S BROTHER**

70.     In January of 2017 Sandhu invited Gill to have dinner with Sandhu and her brother. Sandhu told gill that she is trying to bid for satellite platform in UK called "Sky". She told Gill that it's very hard to get these platforms and she might bid it for two spots, which can cost anywhere between $250,000.00- $500,000.00 Sandhu suggested Gill to bid it jointly and if they can get them, then they can sell one platform at a profit and keep one to launch Jus Punjabi. Gill advised Sandhu to not to do it, as there are no subscription or advertisement revenues in UK and lot of other Indians have lost their shirts. Sandhu told plaintiff that it's very important to have a presence in the United Kingdom to move the company to next level. She also told Gill that she will need some financial assistance.

## **BIDDING RESULTS & ADDITIONAL FUNDS**

71.     Sandhu and her daughter bid and were awarded the platform at a very high price. Sandhu called Gill to come to studio to celebrate the win. In that meeting Sandhu asked Gill to get the money ready as the money was due shortly. Gill told Sandhu that he doesn't have any more money and he won't be able to give her any money, but Sandhu kept on insisting and finally, Gill wired $100,000.00 on February 21st, 2017.

## MEETING WITH SANDHU & BAPAT

72.     Gill requested a meeting with Sandhu and her accountant Bapat during February 2017. All three of them met in the studio and Gill asked them about the letter that Sandhu had sent to IRS back in 2016. Bapat explained Gill that he has been working with IRS auditors on an "offer & compromise" for Sandhu's outstanding taxes and during that conversations the IRS auditors asked him about outstanding loan on Jus books. IRS position was that since Jus books have a high amount of unpaid loans and that this will make it harder for them to accept any "offer & compromise" proposal. Bapat related the same message to Sandhu.

73.     Fearing that IRS may not accept her "Offer & Compromise" proposal, Sandhu asked Gill for that letter from Gill to show IRS that the loan has been converted into capital stock. Sandhu told Gill that it was just a formality for IRS. Gill advised Sandhu and Bapat that this is illegal, and Sandhu should have told him about this. He also advised them that this may be considered as a "mail & wire fraud" and now they need to make it right. Gill offered few options, but Sandhu rejected all of them.

## GILL'S FIRST REQUEST FOR DOCUMENTS

74.     On March 30, 2017 Gill sent the following email to Sandhu with a copy to Jus broadcasting's accountant (Niranjan Bapat), Gill's accountant (Vishaw Sondhi) requesting the tax returns of the company:

From: **Kashmir Gill - JUS TV** <kashmirgill@jusbroadcasting.com>

Date: Thu, Mar 30, 2017 at 11:37 AM

Subject: Re: Need this urgently - Please print it on simple paper and sign it, kindly send me email. Need it for acts purpose IRS

To: Penny K Sandhu - JUS TV <penny@jusbroadcasting.com>

Cc: ranjanbapat@yahoo.com, Vishaw Sondhi <vishaw@vsondhicpa.com>

Dear Penny,

In order to complete my Tax Returns for 2016, kindly furnish the tax returns of all the affiliates, for 2016, pursuant to our understanding and representation made to IRS.

.

Sandhu totally ignored Gill's mail and never responded. Gill's accountant  Vishaw Sondhi sent an email to Sandhu requesting the same documents:

On Apr 14, 2017, at 9:54 AM, Vishaw Sondhi <vishaw@vsondhicpa.com> wrote:

To All of You

Hi I am in process of filling extension for  Kashmir Gill I will really appreciate if you can forward me KI for him as soon as possible or some kind of estimate of Income or Loss for the year 2016. If you have any question please call me on my cell 732-995-3885.

Thanks

After fourteen days, Sandhu, responded to Gill's March, 30th email with the following email:

On Fri, Apr 14, 2017 at 11:30 AM, Penny K Sandhu - JUS TV <penny@jusbroadcasting.com> wrote:

Dear Kashmir, I don't understand what are you asking. As far your money money owed to company it was a debt in our last year tax return and same is showed this year as well.

Penny K Sandhu
JUS Broadcasting Corp.
Tel:  718-752-9290
Fax: 718-752-9212
www.JusBroadcasting.com
-Sent from my iPhone-

Sandhu also responded to Sondhi's April 14th email with the following email:

From: **Penny K Sandhu - JUS TV** <penny@jusbroadcasting.com>
Date: Fri, Apr 14, 2017 at 11:35 AM
Subject: Re: Need this urgently - Please print it on simple paper and sign it, kindly send me email. Need it for acts purpose IRS
To: Vishaw Sondhi <vishaw@vsondhicpa.com>
Cc: Kashmir Gill - JUS TV <kashmirgill@jusbroadcasting.com>, ranjanbapat@yahoo.com


Mr. Sondhi, Kashmir's money was a loan not a partnership. So question of K1 doesn't arise. You can call me at 917-653-6900 for any other question you may have

Penny K Sandhu
JUS Broadcasting Corp.
Tel:  718-752-9290
Fax: 718-752-9212
www.JusBroadcasting.com
-Sent from my iPhone-


After reading Sandhu's email, Sondhi sent the following email to Gill:

On Fri, Apr 14, 2017 at 11:36 AM, Vishaw Sondhi <vishaw@vsondhicpa.com> wrote:

Hi Kashmir
As per our last conversation you mentioned there was a letter issued to IRS for the owner ship. Please call me when you can.
Thanks


Gill responded to Sondhi with the following mail:

On Fri, Apr 14, 2017 at 11:55 AM, Kashmir Gill - JUS TV <kashmirgill@jusbroadcasting.com> wrote:

Here's the signed copy.
On Fri, Apr 14, 2017 at 11:52 AM, Kashmir Gill - JUS TV <kashmirgill@jusbroadcasting.com> wrote:
Dear  Sondhi & Penny,
Kindly see attached.


75.      Sondhi went on vacation.  After he came back, he sent the following email to Gill:

From: **Vishaw Sondhi** <vishaw@vsondhicpa.com>

Date: Mon, May 8, 2017 at 5:43 PM

Subject: Re: Need this urgently - Please print it on simple paper and sign it, kindly send me email. Need it for acts purpose

IRS

27.

To: Kashmir Gill - JUS TV <kashmirgill@jusbroadcasting.com>, Vishaw Sondhi <vishaw@vsondhicpa.com>

Cc: Penny K Sandhu - JUS TV <penny@jusbroadcasting.com>, Niranjan Bapat <ranjanbapat@yahoo.com>

Hi Kashmir

I am sorry for the delay I was out of office after the tax time. I will like to get a better and clear understanding of your investment in JUS TV and others companies if any. As per your letter to IRS and previous emails in this chain of emails it is clear your loan was converted to equity and stock certificate was issued ( please see the July 22 2016 email from Penny).

I will like to review the returns if possible so I can be sure that annual letter which I have to give to your banks regarding your equity share in all the companies is correct. Please get back to me as soon as possible if you will like to arrange a meeting among all the parties I am open just suggest couple of days and timings.

Thanks in advance .

Gill responded to Sondhi's email with the following email:

From: **Kashmir Gill - JUS TV <kashmirgill@jusbroadcasting.com>**
Date: Fri, May 12, 2017 at 3:30 PM
Subject: Re: Need this urgently - Please print it on simple paper and sign it, kindly send me email. Need it for acts purpose IRS
To: Vishaw Sondhi <vishaw@vsondhicpa.com>
Cc: Penny K Sandhu - JUS TV <penny@jusbroadcasting.com>, Niranjan Bapat <ranjanbapat@yahoo.com>

Dear  Sondhi,
In 2013 March, Penny and I along with (Bikram Bhaji) decided to become equal partners (50%) in Pennies following companies:

- Jus Punjabi, LLC
- Jus One Corp
- Jus Broadcasting Corp

A substantial amount of money was invested in  all these companies since then. We trusted Penny with her commitment and never forced her to sign any documents to that  affect. From our side this was never a loan as claimed by Penny, . We never asked for any bank statements, financial transaction or Tax returns to verify the status of our money. Its been five days, since you requested the returns for 2016 but have not received anything back. Please don't request it anymore. I guess I have to find an alternate solution.

regards,

## GILL'S MEETING WITH AN ATTORNEY

76.    Fully convinced, that Sandhu has scammed Plaintiff and that all bill signing, partnership agreement, email offering stocks was a ploy to perpetuate a fraudulent scheme to take money from him. Gill sought legal advice.

## GILL'S FINAL REALIZATION & LEGAL PURSUIT

77.    On June 5th morning Gill tried to log in to his email on Jus Broadcasting but could not log in as Sandhu had changed the password. Later, on the same day Sandhu texted Gill to meet her. By this time Gill realized that Sandhu has a history of using the same technique to lure investors with a false pretense of making them partners and later kick them out of her company. Gill also realized that Sandhu was manipulating and defaming Gill to get the note signed under duress. The same technique she used to:

a.    Pressure her first partners, Lakhvinder Singh & Parveen Singh, to sign an agreement to sell their membership back to her as Lakhvinder was held by immigration and was to be deported. She pressured them saying the company is in loss and she has a buyer for the channel who is ready to buy within certain days. If we don't sell the company, then company will go bankrupt and they will lose all their money. Poor couple signed the agreement'

b.    Pressure her second partner, Karl Khandalawala to get rid of her first partners and then pressured Karl few years later to sell his membership back to her

c.    Pressured her third partner Gill, to get rid of all her previous partners and then trying to get rid of him.

d.    Using all phone calls, emails and bank transfer instructions for committing serious fraud for obtaining money under false pretense.

29.

### LATEST RESEARCH ON SANDHU & HER LATE HUSBAND

78.     Plaintiff discovered her past business relations and her fraudulent means of obtaining monies.  She changed her name from Pawanjit Yogiraj to Penny Sandhu in 2013, in hope of hiding her past deeds to continue to prey upon vulnerable people who are looking to invest in businesses or giving them false hopes of returns by including making promises of partnership etc.

79.     Sandhu's exercise of complete control over the other defendant companies is operating "an association-in-fact enterprise" is a continuing unit functioning with a common purpose. Since the inception of these defendant corporations and their maneuvering, Sandhu has raised capital by fraudulent means using all possible devices including telephoning, texting or emailing fake proposal of partnership or shaming serious business opportunities. She has used illegal schemes to hoodwink authorities including Internal Revenue Services to perpetuate this enterprise.  She has incorporated the other defendants as tools or façade to extract monies from innocent investors and they all worked as one cohesive group from their inception and still subsist in such activities. All these entities might have been different incorporation date, but they share the same soul and works as an enterprise attending to one master Sandhu.

### FIRST CAUSE OF ACTION
### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(a))

### SANDHU, AS PRINCIPAL OPERATOR USED AND INVESTED CASH DERIVED FROM PATTERN OF RACKETEERING ACTIVITY FROM PLAINTIFF, TO ESTABLISH, OPERATE, ACQUIRED, INTEREST IN THE ENTERPRISE WHICH WAS AND IS ENGAGED IN AND AFFECTING INTERSTATE COMMERCE

80.     Gill repeats and re-alleges paragraphs 1 through 79 as if fully set forth herein.

81.     At all relevant times, each of the Defendants and Sandhu was, and are, each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

82. At all relevant times, Plaintiff, was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

83. The Defendants formed an association-in-fact enterprise and the such an enterprise is ongoing one. The Enterprise was and engaged in, and its activities affected, interstate and foreign commerce as demonstrated above. Each of the Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in paragraphs supra, and others to be identified after further investigation and discovery herein, supra.

84. Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Defendants played the same roles in the scheme and pattern of racketeering activity as set forth, supra.

85. The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing real facts or misleading Plaintiff into parting with his monies, through emails, phone calls and texting—having Plaintiff write checks or wire monies to creditors of the defendants; (2) setting up a façade of a partnership to continue to mislead Plaintiff, thereby depriving Gill time value of his money; and, (3) after the scheme was discovered, forestalling remedial litigation by Gill by means of Sandhu's duplicitous interactions and fraudulent projections, emailing, texting falsities assuring him deceitfully that he is a partner. These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission.

86.     Through such patterns of racketeering activity, Sandhu acquired cash proceeds from Gill. She used and invested that cash, which she acquired from Gill through aforesaid racketeering means in to establish new business and operate the association in fact enterprise., engaged in and affecting interstate commerce. Sandhu engineered and participated as a principal in this complained of racketeering activity.  Thus Sandhu schemed and acquired monies from Gill, received income from a pattern of racketeering activity, mail and wire fraud, and the said income was invested in the association in fact enterprise that bears the necessary nexus to interstate or foreign commerce which resulted in injury to the Plaintiff's business or property owing to  Defendant's use or investment of the income in the enterprise.

WHEREFORE, Plaintiff seeks an award of damages in compensation for among other things, the millions of dollars that Defendants defrauded from Plaintiff. Plaintiff further seeks an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

**SECOND CAUSE OF ACTION**
**(VIOLATIONS OF RICO, 18 U.S.C. § 1962(b))**

**SANDHU AND OTHER DEFENDANTS ACQUIRED AN INTEREST AND ALSO CONTROL OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITIES**

87.     Gill repeats and re-alleges paragraphs 1 through 86 as if fully set forth herein.

88.     At all relevant times, each of the Defendant Sandhu was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

89.     At all relevant times, Plaintiff, was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

90.     The defendants formed an association-in-fact enterprise and the such an enterprise is ongoing one.  The Enterprise was and engaged in, and its activities affected, interstate and foreign

commerce as demonstrated above. Each of the Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in paragraphs supra, and others to be identified after further investigation and discovery herein, supra.

91.    Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Defendants played the same roles in the scheme and pattern of racketeering activity as set forth, supra.

92.    The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing real facts or misleading Plaintiff into parting with his monies, through emails, phone calls and texting, (2) setting up a façade of a partnership to continue to mislead Plaintiff, thereby depriving Plaintiff time value of his money, and (3) after the scheme was discovered, forestalling remedial litigation by Plaintiff by means of  Sandhu's duplicitous interactions and fraudulent projections, emailing, texting falsities.  These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission. Through such patterns of racketeering activity, Sandhu acquired new entities, business constituting a part of the enterprise, maintained an *interest* in and *control* of the enterprise *through* a pattern of racketeering activity.  She floated these different entities, paid of the creditors to continue to gain control of them with the monies obtained Plaintiff using fraud.  Sandhu falsely represented a partnership through emails, phone calls, texting etc. to make Plaintiff part with his monies. And she used the said proceeds to the pay off the old creditors, thus acquiring and maintain a complete control of the enterprise. Plaintiff under the

impress that he was a partner, transferred monies through checks, wire transfer and had to travel across state lines at times to take care of the financial needs of Sandhu's floated companies, which are collective an association in fact enterprise.

93.     Plaintiff serious financial loss exceeding 2.2 million dollars owing to such racketeering acts of Sandhu and along with other defendants to acquire, continue to establish and maintain control of the entire companies which are a part of the association in fact enterprise. Sandhu has complete dominion over the enterprise.

WHEREFORE, Plaintiff seeks an award of damages in compensation for among other things, the millions of dollars that Defendants defrauded from Plaintiff. Plaintiff further seeks an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

**THIRD CAUSE OF ACTION**
**(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))**

**SANDHU AND OTHER DEFENDANTS ARE CLEARLY ASSOCIATED WITH THE ENTERPRISE AND ARE CONDUCTING THE AFFAIRS OF THAT ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY**

94.     Gill repeats and re-alleges paragraphs 1 through 93 as if fully set forth herein.

95.     Section 1962(c) of Title 18 of the United States Code makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 93.

At all relevant times, Plaintiff was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

96.     At all relevant times, each of the Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

97.     From 2012 (said date being approximate and inclusive) and continuing to the present, Sandhu and other defendants, have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Although the precise composition of the Enterprise changed over time with the inception, the overall character and purpose of the Enterprise is consistent.

98.     At all relevant times, each of the Defendants are, and is, a person that exists separate and distinct from the Enterprise.

99.     The Enterprise was and engaged in, and its activities affected, interstate and foreign commerce as demonstrated in, Each of the Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in paragraphs supra, and others to be identified after further investigation and discovery herein, supra.

100.    Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First Cause of Action, supra.

101.    The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing real facts or misleading Plaintiff into parting with his monies, through emails, phone calls and texting, (2) setting up a façade of a partnership to continue to mislead Plaintiff, thereby depriving Plaintiff time value of his money, and (3) after the scheme was discovered, forestalling remedial litigation by Plaintiff by means of  Sandhu's duplicitous

interactions and fraudulent projections, emailing, texting falsities. These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission. Through such patterns of racketeering activity, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise in violation of 18 U.S.C. § 1962(c).

102.    As a direct and proximate result of RICO violations of 18 U.S.C. § 1962(c) by the Defendants, Plaintiff has been injured in its business or property, suffering damages in an amount to be determined at trial. The damages to Plaintiff include, but are not limited to, profits made by the defendants since he contributed capital as a partner and other business acquisitions by the defendants that Plaintiff would have been an equal partnership that Plaintiff would have earned in the absence of Defendants' unlawful conduct; other lost business opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

103.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Plaintiff is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

WHEREFORE, Plaintiff seeks an award of damages in compensation for among other things, the millions of dollars that Defendants defrauded from Plaintiff. Plaintiff further seeks an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

## FOURTH CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTY)

104.    Plaintiff repeats and re-alleges paragraphs 1 through 103 as if fully set forth herein.

105.     Sandhu owed fiduciary duties to Plaintiff including a duty of loyalty.

106.     Sandhu is fiduciary relationship to the shareholder Gil. The relationship is bound by conscientious fairness, morality and honesty in purpose, which the law imposes as the guides for those who are under the fiduciary obligations as responsibilities. They are held, in official action, to the extreme measure of candor, unselfishness and good faith. Sandhu breached these principles with impunity. These principles are rigid, essential and salutary. Sandhu instead of granting accounting, transparency attempted to relegate him as a lender and she has damaged Plaintiff by her misconduct. Plaintiffs have been harmed as a direct result of Sandhu's disloyal conduct in an amount to be determined at trial, but in no event less than $10 million.

107.     In addition, because Sandhu was a fiduciary who breached the duty of loyalty, plaintiff is entitled to full disgorgement of all profits that Sandhu earned through his disloyal conduct to the extent that they do not duplicate plaintiffs' other damages.

WHEREFORE, Plaintiff seeks an award of damages in compensation for among other things, the millions of dollars that Defendants defrauded from Plaintiff and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

## FIFTH CAUSE OF ACTION
### (FRAUD)

108.     Plaintiff repeats and re-alleges paragraphs 1 through 107 as if fully set forth herein.

109.     As a shareholder, Sandhu owed fiduciary duties to Plaintiff, including a duty of loyalty. This fiduciary duty required Sandhu to disclose to his business partners facts that were material to their shared business. Yet, Sandhu failed to disclose the revenues that she has collected over a period of time, claiming that the defendants have always been in loss. Gill failed to disclose these facts deliberately, with the intent of preventing plaintiff from discovering her improper transfer to herself of contractual rights that the two of them owned jointly to share the profits.

WHEREFORE, Plaintiff seeks an award of damages in compensation for among other things, the millions of dollars that Defendants defrauded from Plaintiff and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

### SIXTH CAUSE OF ACTION
### (ACCOUNTING)

110.    Plaintiff repeats and re-alleges paragraphs 1 through 107 as if fully set forth herein.

111.    Business Corporation Law Section 720 authorizes a director or officer to bring an action to compel another director or officer to account for his "official conduct" in cases of, among other things, loss or waste of corporate assets or to set aside an unlawful conveyance of corporate assets.

112.    Sandhu has not maintained the corporate structure of the entities, rather she has and continues to use corporate monies for her luxury travels and extravagant expenses instead of paying her and the company's creditors.

113.    Sandhu's conduct in denying plaintiff the continued partnership, freezing him out of the management and affairs of the defendant companies and denying him at least a proportionate share of the corporation's profits all served to defeat legitimate expectations of the plaintiff that were objectively reasonable and central to petitioner's long-standing participation in the venture from the beginning of his investing monies in and to the defendants.

WHEREFORE, Plaintiff seeks an accounting of the books and records of all Defendants entities, and award of damages in compensation for among other things, the millions of dollars that Defendants defrauded from Plaintiff and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

## SEVENTH CAUSE OF ACTION
## (BREACH OF CONTRACT)

114.   Plaintiff repeats and realleges paragraphs 1 through 113 as if fully set forth herein.

115.   Sandhu and Plaintiff entered into a binding, valid, and enforceable contract pursuant to which Gill has more than performed and complied with his obligations under the contract by contributing substantial capital and sweat to the Defendant companies more than his share.

116.   There exist no unsatisfied conditions precedent to the Defendants' performance of their obligations under the contract.

117.   Gill and the Defendants materially breached the contract by failing to provide a shareholder agreement and necessary partnership papers.

## EIGHTH CAUSE OF ACTION
## (PROMISSORY ESTOPPEL)

118.   The Plaintiff, repeats and realleges paragraphs 1 through 117 as if fully set forth herein.

119.   In reliance on the Defendants' promise that he is a partner, Plaintiff refrained from commencing litigation against Sandhu and the other Defendants herein seeking repayment of the loan.

120.   Plaintiff's reliance on the Defendants' promise was reasonable and foreseeable, when she signed the dollar bill, when she created an email address, when she sent an email to him to sign the letter converting the loan to a stock.

121.   The Defendants have breached their promise by failing grant the shareholder agreement and giving access to the books and records of the defendant companies or providing the accounting.

122.    Plaintiff is entitled to equitable relief enjoining the Defendants to honor their promise.

123.    Additionally, Plaintiff has suffered damages as a direct and proximate result of the Defendants' breach of their promise in an amount to be determined at trial.

WHEREFORE, Plaintiff seeks an award of damages in compensation for among other things, the millions of dollars that Defendants defrauded from Plaintiff and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

**NINETH CAUSE OF ACTION**
**(CONVERSION)**

124.    The Plaintiff, repeats and realleges paragraphs 1 through 123 as if fully set forth herein.

125.    Sandhu used false pretenses to obtain funds from Plaintiff promises him equal partnership.

126.    Plaintiff parted with funds exceeding $2m. However, the partnership offer was a ploy to extract funds and use them for her own needs and depriving Plaintiff of his hard money and opportunities.

127.    Sandhu converted funds to her use, though Plaintiff as a partner with the defendant companies was and had a superior right of possession.

128.    Sandhu exercised unlawful and unauthorized dominion over the monies extended by Plaintiff, thereby depriving Plaintiff access or use of his funds.

129.    Plaintiff having realized that the partnership projection was a façade to systematically and fraudulent scheme to part with his monies, he asked for return of his monies for several years. However, Sandhu has refused to return the same.

130.    Plaintiff has suffered damages as a direct and proximate result of the conversion of his funds in an amount to be determined at trial.

WHEREFORE, Plaintiff seeks an award of damages in compensation for among other things, the millions of dollars that Defendants defrauded from Plaintiff and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

### TENTH CAUSE OF ACTION
### (DECEIT)

131.    Plaintiff repeats and realleges paragraphs 1 through 130 as if fully set forth herein.

132.    Sandhu promised, assured and projected Plaintiff as partner of the Defendant business with intent to induce Plaintiff's reliance upon it.

133.    As a partner, Sandhu emphasized upon Plaintiff to invest more than 2 million dollars over a period of time for his partnership interest, supra.

134.    Sandhu made the partnership with the scienter and intent to defraud Plaintiff.

135.    Plaintiff suffered a loss of more than 2 million dollars.

136.    Sandhu and all the defendants are liable for the harm caused to Plaintiff, an amount to be determined in the trial.

WHEREFORE, Plaintiff seeks an award of punitive damages, compensatory damages for among other things, the millions of dollars that Defendants defrauded from Plaintiff and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

## ELEVENTH CAUSE OF ACTION
## (DISSOLUTION OF DEFENDANT ENTITIES)

137.   Plaintiff repeats and re-alleges paragraphs 1 through 136 as if fully set forth herein.

138.   Defendants are New York Corporations or foreign Corporations with offices at 36-01 36th Ave, Long Island City, NY 11106.

139.   The Defendant Corporations should be dissolved, or the Defendants, majority shareholders, and/or those in control of the Defendant Corporations should be ordered to take proceedings to dissolve the Defendant Corporations, on the grounds that the Defendants, directors, majority shareholders, and those in control of the Defendant Corporations have been guilty of illegal, fraudulent and oppressive conduct toward the Plaintiff minority shareholder; have and are continuing to operate the Defendant Corporations for the sole benefit of the individual Defendants, unjustly enriching herself at the expense of the Plaintiff minority shareholder; have deprived the minority shareholder of any opportunity to realize a profit or income from his ownership of the Defendant Corporations, either to force, coerce or deceive Plaintiff into selling his share in the Defendant Corporations to Defendants at prices below their actual value and/or to prevent Plaintiff permanently from receiving any return on his investments and any return of his original capital investment; have looted, wasted, diverted and/or mismanaged assets of the Defendant Corporations to enrich herself unjustly at the expense of the Plaintiff minority shareholder; have committed breach of trust and/or breach of fiduciary duty, thereby disqualifying herself from exercising the authority of directors and majority shareholders; have and will in the future perpetuate the existence of the Corporations to continue the wrongs complained of above, and to serve no true corporate purpose but rather to continue to enrich herself unjustly at the expense of the Plaintiff minority shareholder; all pursuant to a scheme and conspiracy as set forth below.

42.

140.    At all times material hereto, the ownership of stock in the Defendant Corporations was and is as follows:

141.    Plaintiff is the sole minority shareholder of each of the Defendant Corporations.

142.    Plaintiff received the shareholdings listed above for value, including cash, in excess of two million two hundred thousand ($2,200,000) dollars.

143.    At the time Plaintiff acquired his interest in the Corporations, he had a reasonable expectation of continued participation with the management of the Defendant Corporations.

144.    Plaintiff's investment was given to provide necessary and needed funds to pay creditors of the Defendant Corporations which insured the continued viability of these entities.

145.    At all times material hereto, there was and is no market for the shares of the said Corporations.

146.    At all times material hereto, Defendant Sandhu is and was the President, chief executive officer and majority shareholder of, and has acted as the dominant shareholder and dominant director of and has been in control of the Defendant Corporations and owe and owed the Plaintiff the duties of a fiduciary with respect to the operations of the Defendant Corporations.

147.    Defendants Sandhu conspired to commit and did and are committing fraud, breach of trust and breach of fiduciary duty, mismanagement, looting, waste, spoliation and misuse of corporate assets, and operating the Defendant Corporations unlawfully to serve no true purpose of the Corporations, but rather to enrich herself unjustly, at the Plaintiff minority shareholder's expense and to provide benefits solely to herself, willfully, wantonly and maliciously to damage and defraud Plaintiff and to force, coerce or deceive Plaintiff into selling his shares in the Defendant Corporations

to Defendant Sandhu at prices vastly below their actual value and/or to prevent Plaintiff permanently from receiving any return on his investment or any return of his original capital investment.

148.     Pursuant to said course of action, Defendant Sandhu has acted fraudulently, wrongfully, illegally and oppressively to freeze Plaintiff out of the Defendant Corporations by making it impossible for him to participate as an officer or director, and by denying him any form of return on his investments therein, including failure to pay interest on his investment acknowledged to be due to Plaintiff from Defendant Corporations, the assets of which

149.     Defendant Sandhu has now transferred to herself, and failure to pay dividends from any of the Defendant Corporations to date, despite the availability of funds for proper payment of dividends, and by illegally accumulating excessive earnings in said Corporations above and beyond sums needed for foreseeable projects, either to force Plaintiff to sell his shares in the

150.     Defendant Corporations to the Defendants at prices vastly below their value or to prevent Plaintiff permanently from receiving any return on his investments or any return of his original capital investment.

151.     As a result of Defendant Sandhu's acts, Plaintiff has and will continue to be denied any form of return on his investments in the Defendant Corporations and any return of his original capital investment.

152.     Defendant Sandhu has caused the Defendant Corporations to fail to provide Plaintiff with financial statements upon lawful demand, have failed to give Plaintiff legally required notice of shareholders' meetings and have caused Plaintiff to be given misleading, incomplete and erroneous financial statements, all as part of a continuing scheme to conceal fraud and conspiracy to commit various wrongful and illegal acts of waste, mismanagement, breach of fiduciary duties,

looting, and oppressive conduct, and to force, coerce or deceive Plaintiff into selling his shares in the Defendant Corporations to Defendants at prices vastly below their value.

153.     Pursuant to said conspiracy, Defendant Sandhu has wasted, looted and depleted the retained earnings of Plaintiff in each of Defendant Corporations.

154.     Pursuant to said conspiracy, Defendant Sandhu has caused the Defendant Corporations to incur excessive general and administrative expenses all in an effort to deprive Plaintiff from receiving a return on his investment or receiving retained earnings.

155.     Pursuant to said plan of action, since Plaintiff invested monies into Defendant Corporations and continuing, Defendant Sandhu has caused the Defendant Corporations to pay Defendant Sandhu excessive salary, wages, loans, and bonuses wrongfully, in bad faith, fraudulently, illegally, and in an effort to loot, divert, waste, and mismanage corporate assets, oppressively to the rights of the Defendant Corporations and the Plaintiff.

156.     Pursuant to said course of action, the Defendant Sandhu has wasted and mismanaged corporate assets by, among other things, by failing to pursue legitimate broadcasting outlets, failing to create broadcasts that appeal to the Indian community and otherwise failing to properly promote the Defendant Corporations.

157.     Pursuant to said course of action, Defendant Sandhu has neglected failed and refused to allow Plaintiff to examine the books and records of Defendant Corporations to determine the extent of the defalcation committed by Defendant Sandhu.

158.     Pursuant to said course of action, Defendant Sandhu has committed and will continue to commit other acts of fraud, mismanagement, waste, looting, breach of trust and breach of fiduciary duty and oppressive conduct.

159.     Plaintiff has no adequate remedy at law for the wrongs and injuries complained of herein.

160.     Any demand on the boards of directors of the Defendant Corporations to take actions or proceedings to correct and prevent the wrongs and injuries complained of herein would be futile in that the Defendants dominate and control the Defendant Corporations, as alleged.

161.     No previous application for the relief requested herein has been made, except that a special proceeding for dissolution of the Defendant Corporations was dismissed, with prejudice with respect to statutory dissolution, and without prejudice and with leave to plead again with respect to the non-statutory cause of action.

**WHEREFORE**, Plaintiff demands that the Defendant Corporations be dissolved and that the Defendants be ordered to take all necessary and proper steps and proceedings to dissolve the Defendant Corporations, attorney's fees and costs of suit and such other relief as to the Court seems just.

## TWELFTH COUNT
## DISOLUTION OF DEFENDANT ENTITIES PURSUANT TO
## N.Y. BUS. CORP. LAW § 1104-A

162.     Plaintiff repeats and re-alleges paragraphs 1 through 161 as if fully set forth herein.

163.     Plaintiff is the holder of fifty (50) percent of the Common shares /Common units in each of Defendant Corporations. Plaintiff are each entitled to vote for the election of directors. No other class of shareholders are entitled to vote on any corporate matters.

164.     To the best of Plaintiff's knowledge, Defendant Sandhu is the owner of the balance of the fifty (50) percent of the Common shares/Common units of each of the Defendant Corporations.

165.    None of the shares of Defendant Corporations is listed on a national securities exchange, or is regularly quoted in an over-the-counter market by a member of a national or affiliated securities association.

166.    Said Defendant Corporations are in the business of broadcasting cable television programs which are focused upon the Indian Community.

167.    Plaintiff requests that Defendant Corporations be dissolved pursuant to N.Y. Bus. Corp. Law § 1104-a because the Director, Defendant Sandhu is the person in control of the Defendant Corporations and is guilty of gross continuing oppressive action toward each of the Plaintiff.

168.    Plaintiff has been denied any role as a as a director of Defendant Corporations in which Plaintiff have a substantial financial interest.

169.    In addition to the aforementioned denial to serve on the board of directors and as an officer of that corporation, Plaintiff has been forbidden the right of entry to the corporate property in Long Island City, New York, which action constitutes the most flagrant, oppressive freeze-out of a minority shareholder of a corporation.

170.    Plaintiff has been emasculated to the point that he is neither consulted with nor informed about the operation of the Defendant Corporations. As a shareholder/unit holder of Defendant Corporations, Plaintiff has been given no real authority or role in the operation of the company. He was not consulted about the any Board of Directors meetings nor has he been privy to any discussion about the management of the Defendant Corporations by Defendant Sandhu. The above-mentioned actions constitute a freeze-out.

171.    Said Defendant Corporations are at present entirely solvent and wholly able to pay all of its obligations in due course.

172.   The oppressive actions of the Defendant Corporations, through its officers and directors as set forth herein have severely damaged Plaintiff's reasonable expectations of a management role and financial security and constitute a freeze-out of Plaintiff' interest.

173.   The Defendant Corporations, through Defendant Sandhu, constituting a majority of the Board, has engaged in oppressive action to defeat the reasonable expectation of Plaintiff that they are entitled to a share of corporate earnings, a place in corporate management and other financial security attendant to the ownership of the aforementioned minority shares in the corporation.

174.   The Defendant Corporations, through its employees including, but not limited to Defendant Sandhu, knew or in the exercise of reasonable judgment should have known of the expectations of Plaintiff herein referred to.

175.   No remedy exists, short of dissolution of the corporation, to properly protect the rights and interests of Plaintiff.

176.   Plaintiff has no adequate means of recovering his investment or equity, short of dissolution pursuant to N.Y. Bus. Corp. Law § 1104-a.

177.   The Defendant Corporations have over the past few years pursued a course of conduct which has consistently stripped Plaintiff of his right and ability to properly manage those portions of the company for which he has responsibility and to properly protect his investment as a minority shareholder.

**WHEREFORE**, Plaintiff prays for an order of this Court dissolving Defendant Corporations, attorney's fees and costs of investigation and suit, and for such other and further relief as may be appropriate.

## THIRTEENTH COUNT
## (UNJUST ENRICHMENT)

178.     Plaintiff repeats and re-alleges paragraphs 1 through 177 as if fully set forth herein as if the same were set forth herein at length.

179.     Commencing in 2011, Defendant Sandhu, individually and in behalf of Defendant Corporations requested that Plaintiff invest monies in Defendant Corporations which funds were to be used to pay third-party creditors.

180.     Defendant Sandhu expressly represented to plaintiff that the investment would entitle him to an ownership interest in Defendant Corporations in addition to said sums being treated as loans on the ledgers of Defendant Corporations.

181.     Between 2013 and 2017, Plaintiff loaned to Defendant Jus Broadcasting Corp. the sum of $437,417.28.

182.     Between 2011 and 2014, Plaintiff loaned to Defendant Jus Punjabi LLC the sum of $1,578,766.40.

183.     Between 2013 and 2015, Plaintiff loaned to Defendant Sandhu the sum of $10,977.38.

184.     All sums aforementioned represented borrowed funds by Plaintiff who has paid interest on these monies, and is entitled to repayment of same.

185.     In 2016, Plaintiff and all Defendants executed a document stating that these sums were consideration for a fifty (50%) percent interest in the Defendant Corporations in addition to the obligation of all Defendants to repay same.

186.     Defendants have been unjustly enriched by failing to return sad funds with interest.

49.

187.     Despite ongoing demand, the Defendant Corporations and Defendant Sandhu have neglected, failed and refused to repay the debt aforementioned along with reasonable interest.

WHEREFORE, Plaintiff respectfully requests judgment for compensatory damages, interest, attorney's fees and such other and further relief as this Court deems to be equitable and just.

## FOURTEENTH COUNT
## (PIERCING THE CORPORATE VEIL)

188.     Plaintiff repeats and re-alleges paragraphs 1 through 187 as if fully set forth herein as if the same were set forth herein at length.

189.     The Defendant Corporations are in adequately funded.

190.     Sandhu has become so improperly entwined in the business and financial affairs of the Defendant Corporations that her actions have confused and intermingled the activity with substantial disregard of the separate nature of each Defendant Entity.

191.     Sandhu has become the alter ego of each entity by ignoring the fiduciary duty owed to each entity commingling funds, operating each Defendant entity in the name of another Defendant entity and by making impermissible personal payments and/or asset transfers, with the intent to perpetrate a fraud or defeat the claims of third parties in such a manner as to evade the law.

192.     The actions aforementioned by Sandhu have effectively blurred and eliminated any corporate immunity to which she might be otherwise entitled and is personally responsible for all debts and obligations as aforementioned.

**WHEREFORE**, Plaintiff respectfully requests judgment for compensatory damages, interest, attorney's fees and such other and further relief as this Court deems to be equitable and just.

Dated: 2/25/2019

ALAN R. ACKERMAN, ESQ.
LAW OFFICES OF ALAN R. ACKERMAN
1719 Route 10 East, Suite 106
Parsippany, NJ 07054
(973) 898-1177
(973) 898-1230 – Facsimile
araesq@alanackermanlaw.com
Attorney for Plaintiff

51.